**In the Matter of UNITED STATES of America, Plaintiff,**

v.

**Errol Leslie MERRIMAN, Defendant.**
**Cr. No. 123–58.**

United States District Court
D. Utah,
Central Division.
April 6, 1959.

C. Nelson Day and J. Thomas Greene, Salt Lake City, Utah, for plaintiff.

Donald B. Holbrook, Salt Lake City, Utah, amicus curiae for defendant and attorney for the United States of America and for the United States District Court, District of Utah.

E. R. Callister, Jr., Atty. Gen. of Utah, Walter L. Budge, Deputy Atty. Gen. of Utah, Milton A. Melville, County Atty. for Millard County, Utah, Fillmore, Utah, for State of Utah.

RITTER, Chief Judge.

The defendant, Errol Leslie Merriman, is in the Salt Lake County Jail. He was placed on probation by this court on No-vember 25, 1958. He was not released on probation until December 12, 1958.

This delay was for the purpose of enabling the United States attorney to communicate with the county attorney to determine whether or not the State desired to dismiss its two charges and for the further purpose of having the attorney prepare a letter for the court's signature addressed to the Veterans Administration Hospital at Sawtelle, California conveying the court's recommendations with respect to hospitalization for the man. Sawtelle is near his home, he had spent some time there, they had records about him, and the physicians presumably were familiar with his case.

The deputy United States attorney reported to the court on December 12, 1958 that the county attorney involved would not withdraw charges against the defendant. The following conversation between the deputy United States attorney and the court then transpired:

"The Court: What do you want me to do about it?

"Mr. Greene: To see whether the court would desire to permit the custody of this man to be taken by the state officials. They consider that the man is a ward of the Federal Government and in terms of comity do not want to take custody if the court does not desire it.

"The Court: Have you charged him with anything here?

"Mr. Greene: We have, and the court has placed him on probation.

"The Court: Those recent offenses are not federal offenses?

"Mr. Greene: No, they are not, but they take the position there that since he is on federal probation, without the court's direction—

"The Court: That's right, they shouldn't interfere with his probation anyway. I think he ought to be brought in here to show cause why we shouldn't revoke his probation.

"Mr. Greene: These were pre-existing matters before he was placed on probation.

"The Court: This isn't a new one?

"Mr. Greene: No, these were matters the court requested me to check into to see if we could get them to drop them.

"The Court: I don't care whether they drop them or not. They just better leave that probation alone." (R. Supp. p. 37)

Following this proceeding the United States Marshal placed the defendant on a bus pursuant to the court's probation order and sent him to California. The bus stopped at Fillmore and the sheriff took him off the bus and locked him up in the county jail on December 16, 1958 under one of the previous state charges.

The court ordered a writ of habeas corpus to issue and brought the defendant before him on January 5, 1959. On that occasion the court said:

"What we are doing is protecting our probation here. I put this man on probation and sent him home down in California. He gets to Fillmore and the sheriff picks him up on a state charge, not a new one, an old one.

"I brought him here on a writ of habeas corpus and I want him sent down pursuant to my order of probation. And I am not going to make any order about the sheriff or the state authorities, but if it is necessary to I will. You just see that he gets down home, will you.

"Mr. Day: All right your Honor.

"I might report to the court that Mr. Milton Melville, who is the county attorney at Fillmore, called me with regard to this case, I believe it was Friday evening, and he stated he didn't want to appear in any manner contemptuous of the court or anything like that, but he would like their viewpoint presented to the court, and I told him if the court permitted—

"The Court: Why didn't he come up? I would be glad to hear from him.

"The point of the matter is we have had all kinds of medical examination and investigations of this man, he has a bad record, he has been in prison a lot, he is old and he is decrepit, and I don't think it would serve any useful purpose, and certainly not the ends of justice, to lock this man up, that is all.

"He would like to go home to his wife, and his home is near a veteran's hospital that he might have access to for medical treatments. He is a veteran.

"Now, I don't know what the county attorney's point of view is, but I would be glad to have him come in and tell me.

"I wish you would convey the court's point of view, namely, that as long as one of these men is on a federal probation we are not going to have him picked up by the state authorities on any old charge. If he commits a new offense we may revoke his probation, bring him back here, and send him into a prison, or we may let the state authorities handle him. We do both things here. But this is an old charge, and we are not about to let the state interfere with his probation, that is all there is about that. That is why he is here. And the order will be that he go on down to his home in California pursuant to our probation order and stay there and keep out of trouble.

"I have reached down there in Fillmore and brought you up here so we can put you on that probation I ordered for you.

"If Mr. Melville wants to come in and talk to me, you tell him I would be very happy to talk to him.

"Mr. Day: He made a brief statement. I could say it in about twenty seconds.

"The Court: Go ahead.

"Mr. Day: The defendant apparently came to Fillmore and purchased a home with a bogus check

and used that as the basis of purchasing an automobile.

"The Court: There isn't any doubt about it, he is a bad check artist and he has a terrible record, it is awful. The question is what to do with him. He has been in prisons and jails most of his lifetime. I don't think he is going to be among us very long. I don't think you can help him by putting him back in jail. I don't think you are going to rehabilitate him that way. I believe there may be a little hope for him staying out of trouble if he goes back to his wife and tends to business.

"Mr. Day: That was the extent of it, your Honor.

"The Court: All right, that will be the way we will handle it.

"Mr. Spafford: Mr. Merriman is without funds.

"The Court: I already ordered that once. I ordered the marshal to buy him a bus ticket, and he was on his way on that bus ticket. Maybe what we ought to do is have the state pay his way. They have interfered with this.

"Mr. Day: I assume, your Honor, the balance of his ticket would be available.

"The Court: The marshal will attend to that. Get him on that bus.

"Mr. Day: Thank you.

"The Court: I won't make any order reaching down there against the county attorney and the sheriff, but if they pick him up again I will have them up here." (R. Supp. pp. 4 to 7)

At this proceeding the court said that he would make no order compelling the state authorities to do anything, because he didn't think it would be necessary. The court thought that once the situation was explained, as it was from the bench, that some of the courtesy and comity the state is talking about would be accorded this court—particularly in view of the message sent by the county attorney to the court through the deputy United States attorney that the state authorities considered the man a ward of the Federal Government, and that they did not want to take custody if the court did not desire it.

Following this proceeding the marshal again bought a ticket at the expense of the United States and placed the defendant on the bus pursuant to the court's order of probation. When the bus reached Fillmore the sheriff, upon the advice of the county attorney, again took the defendant off the bus and locked him up in the county jail on January 5, 1959.

The court issued an order to show cause why a writ of habeas corpus should not issue and why the state authorities should not be enjoined from interfering with the probation. The hearing was held on that order on January 16, 1959.

The court issued its order for a writ of habeas corpus, directed the marshal to serve it upon the sheriff, ordered the marshal to take the defendant into custody at Fillmore and further directed the marshal to drive him in the marshal's car from Fillmore to his home at Bakersfield, California. The Attorney General of the State of Utah appealed this order and obtained a stay of execution from a judge of the Court of Appeals for the Tenth Circuit.

The United States Marshal obeyed the court's order to serve the writ of habeas corpus upon the sheriff, and the sheriff surrendered the custody of the defendant to him. The marshal did not, however, take the prisoner, as ordered, from Fillmore to Bakersfield, California pursuant to the probation order. Instead, he brought the prisoner back to the Salt Lake County Jail where he has been lodged since January 17, 1959.

## I.

"For now so strange do these things seem."

—Tennyson

We are therefore confronted with a strange situation. The defendant is unlawfully in custody. He is being detained by the Federal Government.

There is no Federal charge pending against him. And he has not violated his probation order.

The defendant is in jail and no judge has ordered him to jail. The sentencing judge could not do so, for the man has not violated his probation order. Kirk v. United States, 9 Cir., 185 F.2d 185; Escoe v. Zerbst, 295 U.S. 490, 55 S.Ct. 818, 79 L.Ed. 1566. The sentencing judge exhausts his power of sentencing when he places a defendant upon probation. The man is entitled to be free under his probation order. But Merriman is not free.

The argument is made that the state authorities and the circuit judge have not interfered with the writ of habeas corpus nor with the probation order of the trial judge. It is suggested that all the state authorities and the circuit judge have done is to prevent the marshal from taking him to California.

Let's ask ourselves some questions about this. The defendant is not in the custody of the state authorities. The sheriff, upon the advice of the county attorney, honored the writ of habeas corpus and surrendered custody to the United States Marshal. The defendant is in the custody of the United States. He has been locked up in the Salt Lake County Jail, in violation of the terms of that probation order, since January 17, 1959. The court sought to give him his freedom, not only through the probation order, but by the writ of habeas corpus directed to the state officials.

It appears to this court that not only has there been an interference with the court's order of probation, but there has been an interference with, and, in effect, a suspension of the writ of habeas corpus in this case. The conditions of the probation order are set forth in the note.[1]

A. How is the defendant going to get treatment at the Sawtelle Veterans Hospital, as the court directed him to do, if the state prosecuting authorities lodge him in the county jail at Fillmore, or if, by obtaining a stay from a judge of the Court of Appeals, they lodge him in the Salt Lake County Jail?

At the hearing of January 16, 1959, the court asked the deputy attorney general of the State of Utah that question and the reply was:

"Mr. Budge: Well, if your Honor please, we were not represented at the hearing. Of course, we have medical evidence that he doesn't need the treatment."

This is an interesting suggestion: that the sentencing judge's determination of defendant's need for medical treatment can be reviewed in this manner by the joint efforts of a justice of the peace in Millard County, who issued the warrant of arrest, the county attorney of Millard County, who ordered the sheriff to take the defendant off the bus, by the state's attorney general, who now is prosecuting an appeal to carry their purpose into effect, and by a judge of the Court of Appeals, who issued a stay contrary to what had been the law of the 10th

---

1. In the probation order imposition of sentence was suspended. It then provided:

"That the defendant be placed on probation, under the supervision of the United States Probation Officer for the District of Utah, Salt Lake City, Utah, for a period of Five (5) Years, under the following conditions:

"1) That he immediately and directly return to his home in Bakersfield, California, and live with his wife there;

"2) That he stay out of all trouble with the law, particularly that he not become involved in the issuance, passing or making of bad checks of any kind;

"3) That he make an effort to be admitted for treatment at the Veterans Hospital at Sawtelle, California;

"4) That he pay back to the Clerk of the U. S. District Court, Salt Lake City, Utah, the money advanced to him by the United States Marshal for the District of Utah for travel and subsistence to Bakersfield, California.

"5) IT IS ORDERED that supervision of probation be transferred to the U. S. Probation Officer for the Southern District of California, at Los Angeles, California."

Circuit for a quarter of a century, during which the principle had been reiterated by the Court of Appeals in eight additional decisions.

B. Moreover, the probation order directs. the defendant to pay back to the clerk of the United States District Court the monies advanced to him by the United States Marshal for travel and subsistence to California. How is he going to do that if he is locked up?

C. And, in addition, the order is that supervision of probation be transferred to the United States Probation Officer for the Southern District of California at Los Angeles. Now, how is that going to be done in the circumstances in which the defendant now finds himself?

## II.

" * * * but this is wondrous strange."

—Hamlet.

All of this is strange because it has been the law in this circuit since January 23, 1933 that in situations of this kind the defendant on probation is in the continuing jurisdiction of the sentencing court, which has the power to protect its probation. (Grant v. Guernsey, 10 Cir., 63 F.2d 163; Frad v. Kelly, 58 S.Ct. 188, 302 U.S. 312, 82 L.Ed. 282; Dillingham v. United States, 5 Cir., 76 F.2d 35, 36: "One on probation is not at large, nor at liberty, except within the circumscribed limits permitted by his probation and is in law and in fact in custody and under control of the court of his probation.") That view of the Court of Appeals has been affirmed and reaffirmed in at least eight cases.[2]

The doctrine of Grant v. Guernsey was reiterated in Rawls v. United States, 10 Cir., 166 F.2d 532, 534, where the Court of Appeals said:

"Even though Guernsey could not himself have challenged the state's

violation of the rule of comity in the absence of a consent to a waiver of the jurisdiction of the Federal Court, his petition for the writ did call the violation to the attention of the Federal Judge under whose jurisdiction he continued to remain, and he took appropriate action to register his disproval thereof. He had the power to protect his jurisdiction and could have taken independent action no matter how the violation was called to his attention."

## III.

" 'Tis a strange and painful mystery!"

—Hood.

It is strange also that this situation arises because, in the first place, the state prosecuting officers requested the Federal Bureau of Investigation to find the defendant, for he had left the state. Those same prosecuting officers requested the United States to press the Federal charge of interstate transportation of a forged security against him. The man had passed two bad checks. Not only did the State of Utah request the United States to take over this matter, but, as shown by the excerpt from the transcript of the proceedings of December 12, 1958, when the state aspect of the problem was called to the court's attention and the court asked the United States attorney, "What do you want me to do about it?", the reply was:

"Mr. Greene: To see whether the court would desire to permit the custody of this man to be taken by the state officials. They consider that the man is a ward of the Federal Government and in terms of comity do not want to take custody if the court does not desire it." (R. Supp. p. 36.)

The court was therefore informed that the state prosecuting officials did not

2. Wall v. Hudspeth, 10 Cir., 108 F.2d 865; Rosenthal v. Hunter, 10 Cir., 164 F.2d 949; Rawls v. United States, 10 Cir., 166 F.2d 532; Craig v. Hunter, 10 Cir., 167 F.2d 721; Stripling v. United States,

10 Cir., 172 F.2d 636; Mitchell v. Boen, 10 Cir., 194 F.2d 405; Werntz v. Looney, 10 Cir., 208 F.2d 102; Hall v. Looney, 10 Cir., 256 F.2d 59.

want to take custody of the defendant if the court did not desire it, and that they considered the man a ward of the Federal Government. The court went ahead on this basis. What has the State of Utah got to complain about?

## IV.

" 'Tis strange, 'tis passing strange;
" 'Tis pitiful, 'tis wondrous pitiful."
—Othello.

A good deal has been said about the terrible plight that state prosecuting officials will be in if the Court of Appeals for the Tenth Circuit does not overrule its long line of decisions starting with Grant v. Guernsey, 10 Cir., 63 F.2d 163. In fact, the justice of the peace, the county attorney, the sheriff at Fillmore, Utah, and the judge of the Court of Appeals, have now been joined by the attorney general of the State of Utah and by the Department of Justice of the United States of America.

The Department of Justice asserts that the decision of the Ninth Circuit (Strand v. Schmittroth, 251 F.2d 590) is the better view, although that decision is clearly not in point, and the opinion overstates the effect of the Tenth Circuit decisions. After Schmittroth was released on habeas, he committed another offense and at the time the Ninth Circuit recanted, withdrew and cancelled‧ its "original expression in this case," he was lodged in Folsom Prison. It does not follow from Grant v. Guernsey, supra, that "habeas corpus would now lie to free Schmittroth from Folsom." (See 251 F.2d at page 594). Moreover, the instant probation order differs radically.

The Schmittroth opinion is not convincing in its attempt to explain how the court gets around the plain, clear authority given to Federal sentencing judges in the Federal Probation Act.[3]

The Ninth Circuit recognizes that "it is undeniable and undenied that a federal court can and is bound to interfere with administration of criminal law in the state courts within the same territorial boundaries where rights guaranteed by the Federal Constitution, treaties *or statutes* are involved." 251 F.2d at pages 590, 606. The court bases its decision upon a lack of jurisdiction in the United States district court. But Federal district courts have jurisdiction of criminal cases by virtue of an Act of Congress, Title 18, § 3231, and have authority under the Federal Probation Law to place offenders upon probation. Both of these enactments clearly are within the powers delegated to Congress by the Constitution. The defendant was still in the state and within the reach of Federal district court process. It will be time enough to decide a different case when it shall arise.

The Ninth Circuit protests too much the necessity for continued physical custody. In the circumstances of the instant case, (and that is all we are talking about) the power and authority under Federal statute to treat the offender as provided in the probation order is all that is required.

The issue in this case, except in its narrowest sense, is not whether one defendant, Errol Leslie Merriman, is to be permitted to remain on Federal probation rather than to be taken into custody by officials of the county or state, but whether the Federal probation system, with its

3. The general statutory authority for placing defendants on probation is contained in the first paragraph of Title 18 U.S.C. § 3651 and provides:
   "Upon entering a judgment of conviction of any offense not punishable by death or life imprisonment, any court having jurisdiction to try offenses against the United States, except in the District of Columbia, when satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby, may suspend the imposition or execution of sentence and place the defendant on probation for such period and upon such terms and conditions as the court deems best."
   The section further provides:
   "The court may revoke or modify any condition of probation and may change the period of probation."

painstakingly developed nationwide system of probation counseling and supervision, is to be frustrated.

The Federal probation practice has evolved through the years as the product of the earnest efforts of judges, criminologists, sociologists and legislators to create an effective mechanism for dealing with the criminal defendant as an individual. Its basic philosophy is one of human betterment through rehabilitation of the individual as opposed to the attitude of punitive vengeance which characterized criminal proceedings in past more unenlightened centuries.

If a judge makes a mistake and sentences a man to prison, that mistake is fatal and irremediable. If he makes a mistake and places him on probation, the judge can correct his error and lock the man up if he proves unworthy of the court's trust. It is far better to give a criminal an opportunity to make his readjustment in society without imprisonment, if it is at all desirable, for the adjustment is much less difficult than it would be after a period of incarceration. And, in addition, the taxpayers are saved the expense of housing and feeding and training the man while in prison. Upon probation he is able to provide not only for himself but for his family and dependents.

No one can tell whether a defendant is going to turn out to be a good or a bad fellow. Within some limits of good sense and sound judgment concerning the need to protect society from any likely serious future misconduct, we place him on probation and let him show us what kind of fellow he is. He carries the key to the penitentiary with him. If he violates his probation, he throws away his chance. Other treatment is called for, sometimes by the state, the federal or both governments. The system is flexible with opportunity for the exercise of the broadest discretion.

The Schmittroth opinion (251 F.2d at pages 606–608) seems to be a strange and cavalier treatment of a Federal statute providing new, enlightened, and modern sentencing procedures, the administration of which is invested in the United States district judges.

But that is not all. The dilemma which the Schmittroth decision and the state and federal prosecuting authorities all now attempt to point up is a straw man having no substance. The Department of Justice is in the executive branch of the Federal Government, and the state prosecuting authorities are in the executive branch of the state government.

The courts do not have anything to do with criminal cases until they are filed in the court by the prosecuting authorities. Before that time the prosecuting officials in the executive departments of the two sovereigns have absolute and complete control over the disposition of those cases. The federal and state prosecuting officials communicate with each other in the ordinary and usual course about the disposition of offenders. Often the offender is turned over to the state prosecuting authorities by the Department of Justice. And, on the other hand, frequently state prosecuting officials turn the offender over to the Federal Government for prosecution. The question of which sovereign shall prosecute is determined, as a practical matter, by consultation and cooperation between the Department of Justice and the local authorities.[4]

In the instant case the state authorities asked the aid of the United States to apprehend the man. They asked the United States to prosecute him. They stood by while he was arraigned and presentence investigations and reports were made and prepared. They waited until he was sentenced and placed on probation. The deputy United States attorney reported to the court that they told him they considered the man a ward of the Federal Government and did not want to take custody of him if the court did not desire it. Can they now be heard to say that they disagree with the sentencing judge's treatment of the man, that they would prefer to have him locked up in a peni-

4. The Ninth Circuit recognizes this, 251 F.2d at pages 590, 597, 609.

tentiary, and, by the means used in this case, thwart and defeat a United States district judge's probation order and writ of habeas corpus in aid of it?

It is argued on behalf of the State of Utah that under the view which has been so long held by the Court of Appeals of the Tenth Circuit very serious miscarriages of justice may occur. For illustration, it is said:

Suppose a man commits murder in some state and flees the jurisdiction. Suppose that the state asks the assistance of the Federal Bureau of Investigation to find him, which they do. And suppose further that the Department of Justice charges the man in a United States district court, under Section 1073, 18 U.S.C., with unlawful flight to avoid prosecution. Then, they say, suppose the United States district judge places him on probation and sends him out in society a free man, and the Guernsey decision gives him immunity from prosecution.

Then the argument runs: Wouldn't that be an awful thing to have happen under the Guernsey decision?

This supposed terrible result will not follow unless the prosecuting officials of the executive departments of both sovereigns fail to do their duty. The conclusion that the Guernsey decision grants a Federal probationer carte blanche to commit other crimes with impunity assumes that both the Department of Justice and the Federal courts virtually become partners in his crime. Can any one doubt that if the state in which the murder was

committed requested the Department of Justice to surrender the man that the Department would do so? In any event, the whole problem would be handled between the *executive* departments of the two sovereigns and the courts would have nothing whatever to do with it. The prosecuting officers do not need a Schmittroth decision limiting a court's powers under the Federal Probation Act.

When the case does get into the judiciary, we should brook no interference from the executive department of either the state or the United States.[5]

But let us suppose that the Department of Justice would do such a fool thing as is suggested. Does any one believe that there is a judge anywhere in the Federal court system who would put such a fellow on probation?

We do not need to look around for hypothetical horrible consequences. We have one before us. It would be difficult to find one worse than the instant case. The defendant is on probation, directed to turn himself in to a veterans hospital at Sawtelle, California. He is directed also to reimburse the United States for transportation and subsistence. He is placed under the supervision of the United States probation officer for the Southern District of California. He is given his freedom subject to detailed conditions of probation. And yet he is not free. He is in the Salt Lake County Jail in the custody of the United States Government. He has not violated his probation order in any respect. And there is no other Federal charge pending against him. No Federal judge has committed him to jail.

---

5. The Ninth Circuit, 251 F.2d at pages 590, 609, says:

"The problem was created by the dual sovereignty, state and national, under the Federal Constitution. The power of choice is essentially political and executive in character. Ordinarily, the choice is made administratively by the law enforcement officers, state or national, often after consultation with like officials of the other sovereign. Up until the time proceedings are instituted by the state officers on the one hand or federal officials on the other, the courts of neither sovereign have concern with the choice. After proceedings have been instituted in a court, these may be discontinued without the consent of the defendant *by the political agents* of that sovereignty and the custody turned over to the officers of another for prosecution of defendant. The physical possession of the body of the accused is the key factor."

After proceedings have been instituted in a court, they may *not* be discontinued by the "political agents" of that sovereignty!

The state authorities argue that they have not interfered with the probation or the writ of habeas corpus. The state argues that the stay order of the judge of the Court of Appeals does not interfere with the probation order or the writ of habeas corpus. The state says all that stay order does is prevent the United States Marshal from taking the defendant to California.

Well, he isn't in the veterans hospital at Sawtelle, California. He isn't being supervised by the probation officer of the Southern District. He can't reimburse the United States for monies advanced as he was directed to do. He isn't being rehabilitated. He isn't getting medical treatment which he needs.

■ The probation order of the district court is unreviewable. It cannot be revoked by the sentencing judge himself unless the probationer is in violation of his probation. The Court of Appeals and the Supreme Court of the United States cannot review it. But it is being interfered with and, in effect, reviewed here through the action of a justice of the peace, a county attorney, a sheriff, a circuit judge and the Attorney General of the State of Utah. This is passing strange!

Some suggestions have been made to the sentencing judge in this case that he can take the defendant out of the county jail without violating the stay order of the circuit judge. It is suggested that he can have the marshal deliver him over to the judge in his chambers, that the judge can then direct some one other than the United States Marshal to transport him out of the state. Or, it is suggested, a Federal judge can just order the marshal to turn him loose on the streets of Salt Lake City either with or without conniving with his friends and relations to pick him up and spirit him away. And, it is suggested, the judge could have the marshal bring him over to chambers and then, either himself or by some one else, take the chap down to the airport and send him away by airplane.

The answer to this nonsense is: Does a United States district judge have to kidnap his probationer to enforce his probation order? Does he have to stoop to such skulduggery? Or, is he entitled to stand upon his valid, lawful order made pursuant to the Act of Congress providing for enlightened sentencing procedures and a more humane treatment of human beings who appear before him?

While we are talking about stratagems to defeat the stay order in this case and the purposes sought to be served by it, let us ask ourselves whether on the other hand it is not possible by a small change in the Federal district court probation order to defeat the dicta in the Schmittroth decision as the state authorities ask the court to apply it in this case.

In the instant case the United States Marshal might have been ordered to retain full custody and possession of the defendant, to transport him physically out of the state, and to turn him over to the custody of the probation officer of the Southern District of California, to be placed by him in the veterans hospital at Sawtelle, with a provision that his probation then commence. If the theory of the Schmittroth case is that the state may interfere only if the Federal Government does not have actual physical custody, the effect of that decision can be avoided.

In this case the State of Utah took the defendant in violation of a long established line of cases in the Tenth Circuit. You are going to have trouble with either view if that sort of thing is done.

Such interference as we have had from the local authorities in the instant case can bring nothing but reproach upon the administration of justice. The instant case produces the chaotic and ludicrous situation of a defendant being shuttled back and forth between the Salt Lake and Millard County jails two or three times and the picture of state law enforcement officers lying in wait, watching all the buses, for the purpose of setting at naught a Federal court's probation order.

One of the anomalies in the present case is that the Federal district judge consistently has taken the position that too often the Department of Justice and the United States Attorney are prosecuting purely local offenses. There is too much evidence of a desire, joined in by associations of local and state prosecuting officials, to turn every offense into a Federal case, and make another statistic. It is a sad commentary upon the type of cases in United States district courts these days that far too many prosecutions for interstate transportation of a forged security are simply state bad-check charges, and, again, far too many prosecutions for interstate transportation of stolen automobiles by fifteen, sixteen and seventeen-year-old juveniles are merely local offenses for joy riding. In these instances the court is becoming, in a large part of its business, a juvenile court.

In the instant case, from its very inception, as the transcript shows, the Federal district judge urged upon the United States Attorney his view that this case and others in which defendants are charged with interstate transportation of a forged security, which merely means the man passed a bad check drawn on an out-of-state bank, ought to be turned over to the state for prosecution. It is again strange that this court, entertaining that view, should now have its sentence and probation order being reviewed upon the claim that the court should have turned the man over to the local authorities.

Another solution for problems of this sort is for the district court to order such local cases dismissed and turned over to the state authorities at their commencement in the United States courts.

But, the strangest thing of all in this case is that the Department of Justice of the United States of America has now aligned itself with the state prosecuting authorities in this attack upon the power of a Federal district court under the Federal Probation Act. When, all they needed to do was turn him over to the

state in the first instance and before he was ever prosecuted here.

The Department has advised the court that it will file a brief and argue before the United States Court of Appeals for the Tenth Circuit that the case of Strand v. Schmittroth, 251 F.2d 590 "reflects the better rule and should be followed," and the Department of Justice suggests to the Court of Appeals that its decision in the Guernsey case should be re-evaluated.

The Guernsey decision itself has been interpreted by the Court of Appeals as denying the right of the defendant probationer to appear in the matter. It is therefore obvious that the proceeding on appeal in the Court of Appeals of the Tenth Circuit in this matter may not be an adversary proceeding, for every one in the case appears to be asking the court to overrule its Guernsey case and adopt the dicta in the Ninth Circuit Schmittroth case.

This being an important and serious question of the administration of the sentencing procedures provided by the Act of Congress and of the administration of criminal justice, the court finds that the ends of justice require the appointment of a special attorney to represent the United States of America, and the United States District Court for the District of Utah as amicus curiae, which order, together with this opinion, shall be transmitted to the Court of Appeals as a part of the supplementary record herein.

It is clear that we have here important and serious questions of the administration of the sentencing procedures provided by Congress in the National Probation Act, and of the administration of criminal justice.

Twice the defendant was placed on probation; twice the sheriff removed him from the bus on which the judge had ordered him transported from the state. Twice the judge on his own initiative ordered habeas to issue. And, at last ordered the United States Marshal personally to transport the probationer

from the state and enjoined the state authorities from interfering with the probation.

One of the judges of the United States Court of Appeals for the Tenth Circuit, contrary to what had been the law of the Tenth Circuit for a quarter century, during which the principle had been reiterated by the Court of Appeals in eight additional decisions, stayed the order of the federal district judge.

If the Court of Appeals overrules its Guernsey decision and decides this case in favor of the State of Utah, the United States Probation Act will have been nullified.

Federal district judges will be unable to perform the duty imposed by Congress in the National Probation Act.

They will have to make a Hobson's choice. If the judge releases defendant on probation, the state authorities pick him up at the courthouse door and thwart the treatment contemplated by the Act of Congress. On the other hand, if the judge turns the prisoner over to the state and thus postpones federal probation until after the state has tried, convicted and imprisoned him, federal probation may be postponed for years and the treatment of federal prisoners contemplated by Congress likewise defeated.

At the time of the writing of this opinion, April 6, 1959, the defendant is still in the Salt Lake County Jail, where he has been lodged since January 17, 1959.

A United States district judge has ordered him released on probation. He has not violated the terms of the probation order. He has committed no new offense. There is no federal charge pending against him. And he is there in federal custody without any commitment whatsoever of any judge, and without bail.

"Wheresoe'er I turn my view all is strange."

—Samuel Johnson.